## NATIONAL SURETY CO. et al. v. APACHE COUNTY, ARIZ., et al.

Circuit Court of Appeals, Ninth Circuit.
November 7, 1927.

Rehearing Denied December 12, 1927.

No. 5244.

Depositaries ⟺13—Sureties on bond of bank to secure county deposits to certain amount held without right to require adjustment of matters outside of such deposit, on failure of bank.

Sureties on bonds given by a bank to secure deposits of county funds by its treasurer to the amount of $30,000, but not more, on failure of the bank, holding that amount of deposits, had a plain duty, which was to pay the treasurer that amount, on which they would be entitled to subrogation to his rights as a depositor of the $30,000; but they have no interest, legal or equitable, in illegal deposits by the treasurer above that amount, nor in other illegal transactions between him and the bank, and cannot, in default of fulfilling their own obligations, maintain a suit to require adjustment and settlement of such matters and application of the proceeds in reduction of their liability.

Appeal from the District Court of the United States for the District of Arizona; F. C. Jacobs, Judge.

Suit in equity by the National Surety Company and the Fidelity & Deposit Company of Maryland against Apache County, Ariz., and others. From a decree dismissing the bill, complainants appeal. Affirmed.

Henderson Stockston, Allan K. Perry, and Thomas A. Flynn, all of Phœnix, Ariz., for appellants.

Levi S. Udall, Co. Atty., of St. Johns, Ariz., and Isaac Barth, of Holbrook, Ariz. (Maurice Barth, of St. Johns, Ariz., of counsel), for appellees Apache County and others.

Sidney Sapp, of Holbrook, Ariz., for appellee Hammons.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. The two plaintiffs, surety companies, brought this suit to have determined the measure of their liability on two depository bonds, for $10,000 and $20,000, given by them severally to the defendant Apache county, Arizona, to cover public moneys of the county deposited and to be deposited by its treasurer in the Bank of Winslow. The defendant Jarvis is presently the county treasurer, and the defendant Hammons, as state superintendent of banks, is the ex officio receiver of the bank, which, being insolvent, was closed on October 4, 1924. The court below sustained a motion to the bill, and dismissed the action.

On May 11, 1922, Benjamin Brown, Jr., then the county treasurer, with the consent and approval of the county board of supervisors, duly designated the Winslow Bank as both active and inactive depositary for the county funds, and in order to qualify the bank on the following day caused to be delivered to the county the two bonds in question, which are conceded to be regular in form and valid. Under the state statutes the bank so qualified could lawfully receive and have on general deposit up to, but not exceeding, $30,000 of the county funds.

At a later date, not specifically alleged, the bank entered into an illegal arrangement with Brown, by which it put up with him warrants of the defendant county of the face value of $15,434.10, and of Navajo county, of the face value of $8,110.38, which were to be security for large sums of county moneys deposited in the bank in excess of the $30,000 authorized by law as already explained. Jarvis, Treasurer, v. Hammons, State Superintendent of Banks, 259 P. 886 (decision of Arizona Supreme Court in No. 2606, Oct. 10, 1927).

Touching the amount of county funds in the bank at the time it failed, the averments of the amended bill are somewhat intricate and apparently out of harmony with the statement of the state Supreme Court in the decision just cited, which involved the identical transactions here exhibited. In terms it is alleged that on October 4, 1924, there was a total of $35,599.93, $33,000 of which was in the inactive and $2,599.93 in the active account. But it further appears that, in order to meet an obligation of the county at a Chicago bank, amounting to $23,023, Brown, on October 1, 1924, procured from the Winslow Bank a draft for that sum, fraudulently drawn by the latter upon a New York bank, where it had no funds, in part payment for which Brown gave the Winslow Bank a check drawn upon itself for $11,511.50. The draft, of course, was not paid, and manifestly the transaction could not operate to reduce the county treasurer's credit balance in the active account upon which it was drawn. It is therefore to be taken as conceded that on October 4th the two accounts aggregated $46,610.83, instead of $35,599.93, as categorically averred.

While perhaps not of vital importance, two other items should be explained, in order to make a complete showing of the relation of the bank to the county. For the balance of the draft referred to, the county treasurer issued another check for $11,511.50 to the Winslow Bank upon the Round Valley Bank, another designated depositary for funds of Apache county, which bank was solvent and held in the county treasurer's account ample funds with which to honor the check. This check was given to the Winslow Bank on October 1st, and at the same time the county treasurer turned over for credit to his account two certificates of deposit, each for $5,000, issued to him by a Denver bank for county moneys there on deposit in his account. Both the check on the Round Valley Bank and the certificates of deposit were on October 1st mailed to the First National Bank of Albuquerque, a correspondent of the Winslow Bank. Having received the paper on October 2d, the Albuquerque Bank on that day gave the Winslow Bank provisional credit for the aggregate amount thereof, and upon subsequent advices the credits were made absolute, but not until after the Winslow Bank closed its doors. It turns out that, at the time this paper was received by the Albuquerque Bank, the Winslow Bank had a credit with it, which, inclusive of these items, amounted to $47,572.12, against which it owed $39,000 on account, besides $16,755 by reason of certain discount transactions. By agreement between the receiver and the Albuquerque Bank, the accounts were closed and the Albuquerque Bank delivered to the receiver the rediscount paper and collateral belonging to the Winslow Bank, of a face value aggregating $92,630.14, upon which the receiver has collected in excess of $50,000.

It thus appears that, at the time the Winslow Bank failed, it had received and held, either in money or good paper, which was paid in due course, either before or immediately after its failure, county funds aggregating $68,622.93. It is further alleged that, when the bank failed, it held warrants of Apache county, purchased from divers persons to whom they had been issued, of the face value of $5,153.80.

The prayer in substance is for a decree directing that appropriate steps be taken by the several defendants, to the end that a claim for $33,023 of the amount due the county from the bank be presented and allowed, and paid out of the assets of the bank, as a preferred claim, with priority over the claims of other depositors; that the county warrants, aggregating approximately $29,000, be applied in reduction of the balance, namely, $35,599.93; and that the residue of this item, approximately $6,000, be treated as a general claim against the insolvent estate, on the same footing as the claims of other depositors, to the ultimate end that plaintiffs be required to respond for only

such part of the $6,000 as may remain unpaid after the estate is wound up. This the plaintiffs compute to be less than $4,000.

Whether, if the question had been seasonably raised, the subject-matter of the suit is cognizable in equity, we do not decide, for the reason that such objection has not been specifically urged.

Upon the merits, we find no substantial basis, either in legal right or equitable considerations, for appellants' contentions. By virtue of the bonds given by them, the county treasurer was authorized to deposit, and the bank was qualified to receive, not exceeding $30,000 of the county funds. Such a deposit. up to that amount, created precisely the same relation between the county and the bank as arises in the case of an ordinary general deposit by a private individual. Hence, when the Winslow Bank failed, the rights of the county treasurer in respect to the $30,000 were those of other general depositors; and the rights of the plaintiffs are no greater. The county could assert a general claim against the insolvent estate, and demand dividends, upon an equal footing with other general depositors; but that was all. Had plaintiffs made good their bonds, as was their plain duty, and paid the treasurer the $30,000, they would have been subrogated to his rights, namely, the rights of a general depositor. Instead of pursuing this straightforward course, after a default of three years in the discharge of their obligations, they seek by these proceedings indirectly to establish a preference, which they had no semblance of a right to urge directly. To this end they invoke illegal transactions on the part of the bank and the treasurer touching other public funds, in respect to which they had no obligations, and seek to make them the basis of a preference for themselves. Because, under the trust fund doctrine and in the county warrants turned over to the treasurer by the bank, the county has two possible sources for recoupment of the loss it sustained by reason of the unlawful diversion of its funds, they in effect ask that one of these sources be appropriated to their use. But with the illegal deposits and the incidents thereof they are in no wise concerned, and can neither suffer prejudice nor claim benefit therefrom.

True, without averring the dates of the delivery to the treasurer of the county warrants, or the terms of the agreement upon which they were turned over, they make the formal averment of a general conclusion that the bank deposited them with the county treasurer "to guarantee and insure" the county that the bank would pay out, or over, all county funds in its possession upon lawful demand, etc. But in the decision of the Arizona Supreme Court, supra, copy of which they have placed in our hands and asked us to consider, it is expressly stated that these warrants were placed in the depositary's hands "as security for any additional deposits (over and above the $30,000) that the depositor might make." It is so highly improbable that the bank, which was apparently hard pressed, would gratuitously divest itself of the possession and use of $24,000 of its liquid assets on account of the $30,000 deposit, which it had already qualified itself to receive by compensating plaintiffs for the bonds in question, that we are inclined to regard this general allegation as wholly inadequate. But, aside from that consideration, if we assume an express agreement between the treasurer and the bank that the warrants were to be held as security for the $30,000, it would be without efficacy. There was no authority of law for such an agreement and the treasurer was incompetent to make it. He could not thus bind either the county or the plaintiffs, or qualify the obligations evidenced by the bonds. Respecting plaintiffs' rights, it is not such a case as is referred to in Williams v. Hall (Ariz.) 249 P. 755, where an illegal contract made by a trustee may sometimes be enforced by an innocent beneficiary because of his superior equities. The plaintiffs here paid no consideration and suffered no prejudice; in short, they would be total strangers to such an agreement, with no equities arising from it.

Further illustrative of the inequity of the plaintiffs' demands and of the inconsistency thereof is this consideration: The application of the trust fund theory, upon which they mainly rely, is based upon the assumption that, the county funds in excess of $30,000 having been illegally received by the bank, the county has a superior right to recover for the loss so sustained, where such funds can be traced directly into specific assets in the hands of the receiver, or where, under the liberal doctrine sanctioned by the Arizona courts, it is shown that indirectly the assets coming into his hands have thus been enriched, in which latter case there is a species of equitable lien upon all the assets of the insolvent estate. But not only to the prejudice of the general depositors, but in the face of this superior right of the county, the plaintiffs' demand is that the county employ, in discharging their obligation to it, these very warrants, which equitably belong to it, because they were purchased with its

moneys so illegally deposited, or upon which, to say the least, it has an equitable lien.

This consideration in a measure applies also to the $5,153 warrants of Apache county found in the bank when it passed into the receiver's hands. And besides, if, as seems to have been held by the Arizona courts, the county may require of the receiver that its obligations upon the warrants be satisfied by a credit for the amount thereof on the obligations to it from the insolvent estate, we perceive no reason in law or in equity for compelling the application to be made to the lawful deposit, and denying the right to make it in reduction of the higher obligation arising out of the illegal use of the county's funds. Such a requirement might very well result in injury to the county, and is manifestly inequitable with respect to other general depositors.

Decree affirmed, with costs to appellees.